## CLAUD BOND V. THE STATE.

### No. 10847.   Delivered June 24, 1927.

**1.—Murder—Impeaching Witness—Crime Too Remote.**

Where on a trial for murder, appellant attempted to prove that a witness for the state had been convicted of a crime, more than twenty years before the trial, the objection of the state was properly sustained. Further the witness had received a full pardon for the offense.

**2.—Same—Evidence—Irrelevant—Properly Excluded.**

There was no error in refusing to permit the wife of the deceased to testify to the effect that at the time of the killing, she and her family were going to move to the Canadian river, such testimony having no relevancy to the case.

**3.—Same—Evidence Impeaching Deceased—Properly Excluded.**

There was no error in refusing to permit appellant to prove that deceased had been convicted of cattle theft in Oklahoma some twenty years before the trial, and that he had told appellant that he had served a term in the penitentiary in Oklahoma.

**4.—Same—Continued.**

Nor was it error to refuse to permit appellant to testify to statements claimed to have been made to him by deceased as to sexual relations of deceased with women in Dallas, Gainesville, and Oklahoma. Such evidence could have no possible bearing on any issue in this case.

**5.—Same—Evidence Not Material—Properly Excluded.**

Where appellant was not permitted to testify as to numerous conversations between himself and deceased, none of which had any material bearing on the case, no error is shown in excluding their testimony.

**6.—Same—Continued.**

Nor was there error in permitting the state on cross-examination to prove the same facts which appellant had testified to on his direct examination.

**7.—Same—Evidence—Repetition of Testimony—Properly Denied.**

Where appellant had testified that deceased was advancing upon him at the time he fired the shot, and he feared he was going to be hurt, it was not error to refuse to permit him to testify that he would not have shot deceased if he had stopped when told to do so.

**8.—Same—Recalling Witness—No Error Shown.**

There was no error in permitting the state to recall the wife of deceased and to examine her in rebuttal of the testimony of appellant's wife, especially so in the light of the fact that the court afterwards withdrew her testimony from the consideration of the jury.

9.—Same—Argument of Counsel—Not Improper.

Where appellant complains of the argument of counsel for the state in substance as follows: "I hope you will not suspend sentence, and turn a murderer loose. In two trials of this case I have formed an opinion that the defendant is a murderer." It was in evidence that appellant had been tried before, and the statement of prosecuting attorney that he believed the defendant guilty from the evidence was not improper argument. See Thomas v. State, 28 S. W. 534 and Boxley v. State, 273 S. W. 589.

Appeal from the District Court of Grayson County. Tried below before the Hon. Silas Hare, Judge.

Appeal from a conviction of murder, penalty, twenty years in the penitentiary.

The opinion states.the case.

*Freeman, McReynolds & Hay* of Sherman, for appellant.

*Ray M. Finley*, County Attorney, *Sam D. Wolfe*, Assistant County Attorney of Grayson County; *Sam D. Stinson*, State's Attorney and *Robert M. Lyles*, Assistant State's Attorney for the State.

LATTIMORE, JUDGE.—Conviction of murder, punishment, twenty years in the penitentiary.

Deceased, his wife and three children were picking cotton on the farm of one Finley on the 17th day of November, 1925. Deceased was weighing a sack of cotton beside a wagon. The others were at the end of nearby rows of cotton. Finley was tramping cotton in said wagon, which stood in the turnrow, its tongue north. Appellant in a car headed south, drove up, stopped the car a short way from the end of the wagon tongue, left the engine running, got out, called the deceased to come to him twice, then walked part of the way down meeting deceased and handed him a paper, telling him to read same and have his women folks read it; that he, Claybrook, had torn up (or ruined) his home. Three witnesses testified that in conjunction with this he also said he was going to kill deceased. All the eye-witnesses affirm that after handing the deceased the paper, appellant backed to his car and got a shotgun out of same. The shooting was three or four minutes after appellant reached the scene. All the eye-witnesses save appellant testified that at no time after receiving the paper did deceased advance toward appellant. The distance between appellant and deceased when the fatal shot was fired, was estimated by the witnesses from fifteen to twenty feet. Appellant made no claim that it was less. He

expressly declined to say how far apart they were at the time. Appellant said he shot because he was afraid of deceased and that the latter was advancing upon him, and that he had repeatedly told deceased not to come any closer. Finley, apparently a disinterested witness, said that appellant told deceased not to advance upon him and that the latter did not do so. All parties agree that when shot deceased had his left hand up, gesturing with it, and it seems beyond controversy that his right hand was upon his hip. The position of the right hand was described by a witness who saw it as being against the hip with the palm out. Appellant said just before he shot deceased the latter had thrown his right hand around toward his hip pocket.

There are sixteen bills of exception. It was not error for the court to refuse to give appellant the right to ask state witness Finley if he had not been convicted of a felony and served a term in the penitentiary. It was shown without controversy that Finley had been pardoned and his rights as a citizen restored. The conviction was more than twenty years before this trial. The matter was too remote.

The relevance of the rejected testimony of the wife of deceased to the effect that at the time of the killing she and her family were going to move to the Canadian river, does not appear from the bill of exceptions or otherwise. Appellant testified that deceased had told him they were going up near Gainesville and beyond and ultimately in Oklahoma at the time they left some three weeks prior to the homicide.

Proof that deceased had been convicted of cattle theft in Oklahoma some twenty years before the homicide, seems entirely aside from any issue in this case. Nor do we find any error in the rejection of the testimony by appellant, in substance, that deceased had told him prior to the homicide that he had served a term in the penitentiary in Oklahoma. These matters are complained of in bills of exception Nos. 3 and 7.

Bill of exception No. 4 complains of the refusal to let appellant testify to a number of statements which he said had been made to him by deceased, at unstated times before the killing, relating to sexual relations of deceased with women in Dallas, Gainesville, and Oklahoma. It is stated in the bill that this was offered as shedding light on appellant's state of mind at the time of the shooting and as supporting the theory of manslaughter. It appears without controversy that these two families had lived neighbors during 1925 up to a few weeks before the killing. Appellant swore that they had been friends and that there was no quarrel of any kind between them. He does not undertake to

state any circumstance, act or word of deceased upon which could be based any belief or thought of evil intent on the part of deceased toward the wife of appellant, unless same appears in the writing which he handed to deceased just before he killed him. This writing is as follows:

"Nov. 16, 1925. This is to certify that Claybrooks tried to get me to leave with them when they left here. Mr. and Mrs. Claybrook begged me to leave home time and time again. They said I wouldn't have to work if I would go with them and I could stay with them as long as I wanted to stay. They said they wasn't afraid of what I would do my part. They told me to hide my suit case behind that knoll or hill on their place. And I could be out on the road and ask them for a ride. Mrs. Claybrook give me to understand not to take Glenn (my baby) with me. Even the girls would beg me to go every time they saw me. They said if I would leave and go somewhere else if I wouldn't go with them and stay away until they could get that place we were living on. I could come back and live with them when things were settled and they got moved where we were living. They kept telling me stuff that Claud said about me to them. Tried their best by telling me stuff to get me to leave also. I can say they caused more trouble in our family than anybody that I know of by telling me stuff and begging me to leave home. I am ready to swear to all I've written anywhere or any place.

Mrs. Ella Bond."

We find nothing in this document which could cause appellant to believe that deceased had used insulting language to appellant's wife, or been guilty of insulting conduct toward her. According to appellant's contention, his wife had acted irrationally at times for six or seven years before the homicide. She had complained often of his mistreatment of her, had filed suit against him for divorce on the ground of cruel treatment, had many times accused him of misconduct with other women; would take her suit case and leave home, one time for a week, had told people that he had beaten her black and blue. These and many other things which were testified to by appellant as evincing unsoundness of mind on the part of his wife, were stated by him to be accusations having no foundation in fact. Appellant did not introduce any of his four children, or any other person to establish that such accusations were groundless. All these things practically had taken place in the life of appellant and his wife before deceased ever met either of them, and of course deceased could not be held responsible therefor. We

are unable to see how the statements of deceased in regard to his relations with other women, if admitted in evidence, could have shed any legitimate light on appellant's state of mind at the time of the shooting, or could have tended to support the theory of manslaughter, under the facts of this case.

Bill of exceptions No. 5 sets out that appellant offered to testify that deceased had told him he had rather have a knife any time than a gun, in a fight, and that deceased showed him his knife, which was what was called a stock-knife. Bill of exceptions No. 6 sets out that appellant offered to testify that deceased had told him of a row he had with one Bell, of which deceased had said that if Bell had said anything more, he would have cut Bell; and that thereupon appellant said to deceased, "Bell is an officer and might shoot you," to which deceased replied that he would get him with his knife, and that he would rather have a knife than a gun any time. Bill of exceptions No. 8 sets out that appellant offered to testify that the deceased had told him that he had some trouble with a Mr. Hull, and that if Hull had said anything to him about it, or approached him about it, he would have killed the d....n s....n of a b......h. Under the uncontroverted testimony in this case we fail to see the relevance of the matter set out in either of these bills of exception. Five eye-witnesses to the killing testified that at no time after the paper was handed to deceased by appellant, and the latter went and got his gun, did deceased approach or come any closer to appellant. These same witnesses affirm that at no time after appellant got his gun was deceased any nearer to the latter than fifteen feet, the distance being estimated by some of the witnesses from eighteen to twenty feet. Appellant did not claim in his testimony that deceased drew any knife on him or had any knife in his hand, or that he was nearer than the distance fixed by the other witnesses, or that deceased made any threatening gestures save that, as appellant claimed, he threw his hand behind him. Appellant after calling deceased to come and get the paper, and delivering it to him, as testified to by Mr. Finley, shuffled back to his car in kind of a trot. He secured from the car a pump shot gun loaded with eight shells, and shot deceased with No. 2 shot while the latter was fifteen feet away and making no demonstration or evincing no intention to rush upon appellant or attack him with a knife other than as stated. Finley testified that when appellant got his gun he stood there a few seconds, he and deceased talking, he accusing deceased of something and deceased denying it. That when appellant handed deceased the paper he said, "Don't you advance on me." They

were then close together, and at this time when appellant said deceased had torn up his home, the latter replied that he had done nothing of the kind. Mr. Finley said that appellant shot and killed deceased within three or four minutes after he arrived. We are of opinion that neither of said bills of exception shows error. It is stated in bill No. 9 that on cross-examination of appellant the state proved by him that on the morning of the homicide he went by his mother's home and there got the gun used by him in the killing. It is further stated in said bill that while testifying in his own behalf he was asked by his counsel why he went to his mother's home on said occasion. It is further stated that objection to this question was sustained, which action is assigned as error. Looking to the record, we observe that in appellant's direct examination in chief he affirmed that he got this shotgun at his mother's house. The fact that he repeated the same statement in his cross-examination by the state, would not put such statement in the attitude of being a discrediting or discriminating fact brought out by the opposite party, which appellant would have the right to explain because so brought out. The thing set up in the bill as being the explanation he would have made if permitted to answer the question would not have been admissible as original testimony. What we have just said applies in part to bill of exceptions No. 10, wherein it appears that the state brought out on its cross-examination of appellant that he got the gun, etc., at his mother's on the day of the homicide; that his purpose was to protect himself. It is stated in the bill that his counsel then asked him, "Was there anything in your mind, any apprehension of danger from Mr. Claybrook." Upon objection it appears that the trial court told the appellant he might answer the question yes or no, and that he answered same "yes." His counsel then asked him to state what the apprehension was and the facts on which it was based. It appears from the bill that objection to this was sustained, except the court permitted him to state that his wife told him that morning that he would have to watch Claybrook or that he would be killed. It is stated that if permitted appellant would have testified that his apprehension was based on statements made to him by deceased, which we have held incompetent in passing upon bills of exception Nos. 5 and 6. We note that appellant testified in his direct examination that he got the gun at his mother's, and that he got it to defend himself with if he had to, and that there was in his mind at the time apprehension of danger from deceased. This was his own voluntary explanation of his reason for getting the gun. We are unable to perceive why the

bringing out of the same matter by the state in cross-examination would furnish appellant any ground for elaborating his apprehension and in bringing in the matter held objectionable by the court as set out in said bills of exception Nos. 5 and 6.

The matters set out in bill of exceptions No. 11 were testified to by appellant in the main, and what of such matter was not so testified to, was clearly inadmissible.

Appellant swore that deceased was advancing on him when he shot, and that he shot because deceased was advancing on him, and he feared he was going to hurt him. This being in testimony, we see nothing in the matter complained of in bill of exceptions No. 12 which sets out that he desired to testify that he would not have hurt deceased if he had not been advancing on him, and would not have shot deceased if he had stopped when he told him to stop. This seems but the same testimony in slightly different dress from that already before the jury.

Bills of exception Nos. 13 and 17 renew complaint in a different form and from a different angle of the rejection of testimony set out in bill of exceptions No. 4, and which has already been passed upon in this opinion.

Bill No. 14 sets out that in its rebuttal the state was allowed to recall the wife of deceased, and that she testified that at no time did she ask appellant's wife, or advise her, to leave home; nor did she seek to induce her in any way to leave there or to leave with them; that she did not tell Mrs. Bond that she was a fool for staying there and not leaving. It appears this was admitted over objection, but afterward the court instructed the jury that the testimony of said witness to the effect that she had not sought to induce Mrs. Bond to leave home, was withdrawn from their consideration. We do not regard the matter as having such weight that the court's withdrawal of same would not cure the error, if any, of its admission. Appellant made no claim on this trial that he shot deceased because of anything said by the wife of the latter to Mrs. Bond, or that what she said, if anything in anywise affected or influenced him. Mrs. Bond was not a witness in the case. No one controverted the fact that she did write the document referred to which was carried by appellant and delivered to deceased on the occasion of the homicide.

Bill of exceptions No. 15 sets out arguments of the State's Attorney which was objected to and which the learned trial judge refused to instruct the jury not to consider. It is stated in the bill that the substance of the argument is as follows:

"I hope you will not suspend sentence and make a travesty

of justice, and turn a murderer loose. In two trials of this case I have formed an opinion that the defendant is a murderer."

From other parts of the record it is apparent that the jury were informed that there had been a former trial of this case. Various witnesses refer to their testimony on such former trial. It would hardly be contended that the State's Attorney would be precluded from giving an opinion of the case on trial, and from expressing such opinion. In Thomas v. State, 28 S. W. 534, a death penalty case, the statement of the State's Attorney that he believed the accused guilty, and that he ought to be hung, was held improper, though not calling for a reversal. No statement appeared in said argument in that case that such belief was formed upon facts before the jury. In Boxley v. State, 273 S. W. 589, a statement in argument that the accused was guilty of a cold-blooded assassination, was upheld. See Price v. State, 220 S. W. 89. We are of opinion that in so far as the statement of the attorney in this case referred to his opinion in anywise based on a former trial, was improper; but it was evident that the same witnesses testified on the other trial, and there being no discussion of the facts in evidence on that trial causing the statement made by the State's Attorney, we would not regard the error as of such gravity under the facts in this case as to call for a reversal.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*